Case number 19-1150 et al. Cadillac of Naperville, Inc. Petitioner versus National Labor Relations Board. Mr. McHarg for the petitioner, Mr. Cantor for the respondent. You can start, Mr. McHarg. We hope you're feeling better. Thank you very much, Your Honor, and may it please this honorable court, my name is Michael Patrick McHarg, Sr. I'll be speaking briefly on behalf of Appellant Cadillac of Naperville. Briefly, I'll outline the major points I'd like to cover today, the two issues regarding errors in the handling of evidence, the case reversal regarding the 8A3 discharge, John Busbikas, and if time permits, a couple of the 8A1 issues where the facts and law don't mesh. At the outset, I would like to begin, Your Honors, by stating that this case is a ample demonstration of the rapidly deteriorating conditions in a workplace after a work stoppage that lasts two months, even between employers and employees that have had 25 years of a positive workplace relationship and the importance of the labor laws that govern that relationship. Now, turning your attention to my first issue, there was an issue at the trial with respect to Respondents Council, that was me at the time, being permitted to keep the affidavits of the testifying witnesses until the conclusion of the hearing for the purposes of cross-examination. The judge did not permit this. I cited him board precedent that was precisely on point, and he denied it nonetheless. Simply stated, there is board law on this point, the Walmart case, and it states explicitly that if counsel desires, they may retain the affidavits through the hearing for trial purposes. Ms. McHarg, we have recent circuit precedent in the Napleton case that says the argument you're making to have a valid claim, you have to demonstrate a prejudice, and can you point us in your briefing to us where you argued prejudice? Well, I think the prejudice argument, if I may, Your Honor, the Napleton case also said that it wasn't reaching the merits of the argument, and that the prejudice was probably in the arguments made to the board. Nonetheless, I think we're going to ask the full panel to review that, and the time on that hasn't run. Nonetheless, I think it's possible that an error was made. The affidavit, the board uses the prejudice standard as a smoke screen, and the cases they cite, they're in our system. I would just like to back up. We're not talking about the board here. Our court precedent requires you to have demonstrated prejudice, and I didn't see prejudice argued in your brief. Did you just say you're asking the full board to review that issue right now? That will be up on the Napleton case, Your Honor. The petition for re-hearing and reconsideration on that- The full court or the full board? Full court, I'm sorry. Okay. As for now, that's our precedent. I take it by your answer that you agree that you haven't argued prejudice in your brief to us, and you're planning to raise further review of that legal question. Is that right? There is no argument on I don't believe so, Your Honor. I thought I said that. I'm sorry. No, that's okay. Again, the prejudice argument, if the court will indulge me and take a look at this, is a bit of a smoke screen. This is the classic rules standard debate, a rule defining a triggering condition and a consequence, a standard allowing for consideration and options. The board continues to say, well, you have to show prejudice. The fact of the matter is that the board was unequivocal in their ruling that the trial counsel was entitled to keep it until the end of hearing. The prejudice, the types of cases where prejudice need be shown were on the admission of hearsay testimony or the admission of cumulative witnesses, not something where a specific rule was violated and a penalty could be demonstrated. Walmart and the board tries to point to the case handling manual. The case handling manual itself states the manual is not binding authority and does not constitute a ruling of the board. Accordingly, that can be no more than instructive. We believe that a simple application of the rule here makes infinitely more sense and is consistent with board's law, not interpretations of manuals and the like. Moving on from that, Your Honor, I would like to move to the issue of the admissibility of tape recordings. We admit at the outset, Your Honor, that this is against the extant law that the NLRB permits feloniously recorded tapes into evidence. Is it a felony? Is that the level of offense under state law? I believe it is in Illinois. I know it is in Florida, Your Honor. I know that it's very much a minority rule. I believe there are only six states that have such a rule, but I believe that it is under Illinois law. Yes, and we're asking to use this. To show it's covered by the Illinois law, you have to show that the communication was made under circumstances that the person would reasonably consider to have been private. This recording here, so there should be an expectation of privacy, a reasonable expectation of privacy. In this case, it was a long call, a long discussion with I think all of the mechanics. He began at the beginning saying, you can tell the union everything I'm saying here. Repeatedly throughout the talk that he was giving, he kept saying, and you can tell the union that, you can tell the union that. And he told him they could write it down. So, how would you argue that he had a reasonable expectation of privacy vis-a-vis disclosure to the union? Well, obviously, we weren't afforded the opportunity to make that, whether or not he did. I'm sorry, you weren't afforded the opportunity to make what? At hearing, we weren't afforded the opportunity to make any record regarding what the statute said. Did you ask to demonstrate his reasonable expectation of privacy? We were just overruled on the black letter law that state law is not followed at the hearing. You must have raised the state law issue. We did. When you raised the issue, did you, as part of raising it to the ALJ, did you explain why it applied, why you had a reasonable expectation of privacy, why Mr. Lascaris had a reasonable expectation of privacy? No, Your Honor. We weren't given an opportunity to, and I didn't. It happened very, very quickly. We raised the objection. The judge stated the black letter law. Before the board, did you raise an argument as to why this would even be covered by the statute, why we'd have a reasonable expectation of privacy under those circumstances? I do not recall that argument being in the brief to the board, no. Is it in the brief to us? I don't recall seeing an explanation of, since he repeatedly told them they could write it down and they could share what he was saying with the union. I didn't see an argument in the brief as to why he nonetheless had a reasonable expectation of privacy. No, we probably did not make the argument under the statute either. We were trying to attack the first, the wall, that it's an admissible wall by itself, before trying to meet the elements of the statute. Okay. So, in any event, our argument is that the black letter law here ought to be changed, and that Illinois' interest, you know, the federal statutes regularly recognize state law. The board recognizes state law when it comes to right to work. There's no reason that the would burden board proceedings here. Turning to the most important issue in this case is the termination of John Besbikis, the 8A3 allegation. That allegation had to do with the recent GM case overturning the precedent. The respondent in this case asked for a remand on October 8th of last year, anticipating this very dilemma, and we were denied. And then, ironically, the board stated on the 13th of August that they wanted the issue remanded. Nonetheless, in that statement, the board stated, quote, the board no longer seeks enforcement of the discharge. We can agree with that, and based on that statement, we would seek summary dismissal of the allegation. But failing that, we would argue that the GM case requires a remand, I mean, a dismissal of the allegation based on the new test. Mr. McHarg, did you preserve this issue? Because the ALJ applied both the right-line test, which is what GM now says is applicable, as well as the Atlantic Steel test, and there are findings in the ALJ's decision that Besbikis' protected union activity was primary motivation for discharging him. And I don't see any exception to that on the ground that the employer would have discharged him anyway, even assuming that there could be a showing of a motivation related to his protected activity. Well, yes, Your Honor, I believe the exceptions do cover that, and just as importantly... Just point me to where they do, because I looked at them with this in mind, and I didn't actually see that as part of them. The exception... So in JA, page 47, they accept to the decision that union activity was a motivating factor. This is exception number 11. Exception number 12, except to the portion of finding that Besbikis' behavior was not an egregious violation of company policy, and except to the finding that Besbikis' conduct did not extinguish his Section 7 rights. I think those would be inclusive enough to cover that, Your Honor. Walk me through that, how you would... I mean, because under right-line, the burden is on the employer to ensure that he could have fired the individual anyway, and I mean, this is not a case in which someone is using profane language and getting a warning, and so it would be important to have the employer have proffered proof here in order to preserve the applicability of GM. And I realize there's also the question of the board has said it doesn't want to enforce, where that comes from. To your question, Your Honor, the board in achieving its ruling said that right-line was inapplicable and ruled only on right-line. I mean, I'm sorry, I said right-line, I meant Atlantic Steel. They essentially reversed the ALJ on that, ironically. Again, it leaves us in a bit of a would-not-give-rise-to-the-protection. So the exception... Right. That's a little bit more of an Atlantic Steel characterization, right? Giving rise to the protection. So I guess the question is, do we have anything, any exception to the ALJ's square reliance on right-line that says, look, this is the kind of thing, we can't tolerate this, we would have fired him anyway. To speak to the boss, I mean, this is a small family-run business, this is a man who, you know, his authority in the workplace is really important. So we have a record of, you know, if anybody does this kind of direct insubordination, we do fire them. And I was looking for, and I just didn't see any assertion or evidence to that effect or testimony. Well, I think the severity of the conduct is what we would rely on in saying that we would have taken the same action anyway. We do not think Judge Rozas considered completely in his decision the right-line factors, and nor did he give us an opportunity to go in on his decision. What do you mean by severity of the conduct? It was sort of an insult in Greek, no less, so that maybe no one else would even, Judge Katz's might understand it, but wouldn't. So how is that severe? How is that severe, particularly given the amount of salty language that had come out of Mr. Lascaris precipitating that comment? It's important that you raise that, Judge Millett, and, you know, in terms of what, how you state it was precipitated, factually, that's not correct. The board's brief... Okay, it was preceded immediately in time by... Which was preceded by Besbikis provoking Mr. Lascaris by calling him a liar and raising the temperature in the room. Was he fired? I thought he was fired just for that epithet. I'm not sure it's an epithet for the Greek insult. No one pointed to the other parts of discussion. He was definitely fired. I would say he was definitely fired for that statement. I'm just talking about how the conversation... No, I know, but I'm saying it was, let's just say there was salty language by Mr. Lascaris as well. We do not deny that. All I'm saying is he, you know, if we're playing kindergarten, he didn't start it. No, no, but so what made this insulting Greek severe? I was noting your word that it was severe conduct, and we're just looking at that. We're not looking back at this, but it seems like that type of language was not severe. It seems rather commonplace. I heard a lot of it in the recording of Mr. Lascaris's discussion with the mechanics, so that's what I'm trying to understand. What made it severe? My understanding is that, in fact, the use of Greek was quite intentional, and that's an idiom that has a homophobic basis. You know, obviously it's ethically insensitive, but the nature of the comment itself isn't sort of the routine insulting banner that might have gone on between two of the employees every day on the shop floor. If he had insulted him in English, it might have been different. Well, obviously, the, I mean, it depends on what you say, Your Honor. He said the same thing in English. If you say the same thing in English, it probably doesn't have the same idiomatic meaning. Okay, so it's because he said it in Greek. That's what made it severe? The nature of those words in Greek, yes. Okay, all right. Do my colleagues have any more questions? We're way over time here. Okay, we'll give you a couple minutes on rebuttals still, Mr. McCurd, okay? Thank you, Your Honor. Great, we'll hear from the government now. May it please the Court, Jared Cantor on behalf of the National Labor Relations Board. Your Honors, I'm certainly interested and willing in addressing questions about the substantive unfair labor practices, the seven violations of 8A1, the violation of 8A5. The argument so far has seemed very focused on the procedural questions, which I am more than happy to- I'd like to ask you about the things would not be the same statement. Yes, Your Honor. That could mean an awful lot of different things, and it happened sort of a month before there was a strike, so how was that not how was that not sort of too ambiguous within the setting of even that whole month to count, to have reasonably been interpreted by the employee, Mr. Bispicus, as threatening? Well, Your Honor, so what we have here is an implied threat of unspecified reprisals, so by its nature we're starting with something- How do we deal with reprisals? Things would not be the same, could be we're not going to have our same warm relationship, the sort of family feelings that we had here, things will just get more formalized. Is that a threat? Well, Your Honor, that would be the good- that warm family relationship then starts sounding like the colonial parking case that the Board cited, that the good rapport would be over. I mean, essentially when we're looking at the totality of the circumstances- It'll be a lot more formality to things, right? I'll have to go to the union, and it'll just be more formal. How's that different than sort of the employees will be messing up if they join a union from Phoenix Group? Well, Your Honor, messing up, they're making a mistake, but that doesn't necessarily imply something is going to be different. They're going to be messing something up. But nothing, we have nothing else other than messing up. I think looking at the totality of the circumstances here, an important difference is here we have the company president who is a person and looking at the tableau before the court, everything that ends up spinning out at his direction or by his own actions, him during a conversation, not about the strike, bringing up the strike and saying, if you guys go on strike, things aren't going to be the same. Things won't be the same. I know you're referring to things that happened a month or more later. And I'm just wondering on when we normally, when we look at context in which a statement is made, we look at a sort of more immediate context. If the strike had been three months later, let's assume there's no unfair labor practices in between. So you have, he says this, and then three months later, there's a strike. Would that be relevant context on this ambiguous statement? Well, your honor, the board said it wasn't necessary for the violation here. The fact that everything came later, the gist, the substance of the violation here is looking at the circumstances, the board in that this is an implied threat, it's unspecified reprisals. The board made an inference here that what Lascaris was talking about is not that things aren't going to be the same. They're going to be better. It's that what Gissel talks about, that we might have a disinterested ear here as we're sitting in virtual court, but that an economically dependent employee is going to pick up on the implications of words such as, if you guys go on strike, things aren't going to be the same. Except they didn't see any testimony from, and I'm sorry if I'm not saying it right, this is about how he reacted to that comment. It was interesting to ask him the question, he said that, and then no one said, how did you interpret that? Well, your honor, that's because it's, and this is Avocor, which we cite in our brief, whether that employee is actually coerced or not is not relevant. That's not the test. It's not an automatic disqualification, but it sure would be some relevant evidence. If he had said something, you certainly would have argued it as relevant evidence to show how employees might, a reasonable employee might react. So I was just curious as to why, it just struck me as curious that you have this fairly ambiguous statement. There's no question to the one person, only one employee heard it, and there's no inquiry as to how that person, I'm assuming Mr. Bispicus is reasonable, reacted to it. And then we got, we have to start hunting a month down the road to look for context to transport backwards in time to inform what that sentence meant. Well, your honor, I don't think, again, the board didn't say it was necessary. The board certainly in footnote seven points to circumstances where it does that and it's fine to do, but the board's primary finding here, and this is sort of what we talk about in the brief with the board here made an inference that what he was talking about were going to be negative consequences. And I don't think the company Naperville has ever argued that what he was talking about were things were going to be better. So what, so maybe we're at the knife's edge here. So the board's inference here is that this was, he was talking about negative consequences and the reasonable tendency would have been for an employee to pick up on that, that this was an implied threat. Well, indeed, I mean, putting it together with the testimony that the ALJ is relying on, you have two pieces of testimony that I saw. One is Les Curris, who says that he doesn't remember any discussion about this at all. And then you have Bispicus who said, I initiated the meeting to discuss some issues that I was having in the shop. And after we talked about those issues, he, Les Curris, started the conversation by saying that if we went on strike, things wouldn't be the same. So it doesn't seem like a big struggle to see that there's substantial evidence for the ALJ to find that it was in reaction to and adverse to the notion that they should go on strike. No? I mean, I take it that's your position. Yes, Your Honor. I think that's what the board articulated here before that point that it makes about it not being necessary to look at how everything else plays out here. Oh, Your Honor is... I know, having some problems. We have the world's most temperamental camera, but I think it won't affect the... The audio has stayed so far. It's more important. I would love to, if my colleagues are fine on that point, I would love to ask about this and, in particular, the board's position that a remand is warranted where, as you heard me in questioning Mr. McCarty, I don't see that there's an evidentiary basis for the employer having preserved the second step, bearing its burden under right line. And so that we have the preliminary... I think I should just turn this off. We have the preliminary determination that... Sorry about that. That there was animus in the discharge and then we don't have any exception to that or showing what the policy would have been and whether this is the kind of thing for which they would have discharged Mr. Bespikas in any event. Yes, Your Honor. I would have to... I know we just looked at the exceptions here. Looking at how this played out, the judge did this right line analysis and then the company's and as the board pointed out that that was not the way to do it, that when you have this misconduct that's part and parcel of the protected activity, you don't do right line. It should have just been an Atlantic Steel analysis. The counsel for Naperville accepted to the judge's right line analysis, if my recollection is correct, and the Atlantic Steel stuff. And I believe consistently throughout this, and I might be confusing this maybe with a different case, but my recollection is the counsel did throughout this argue that Atlantic Steel was a bad task, that it privileged horrendous conduct that should be tolerated. But the only... In terms of... And the employer also talked about right line, but only on the first prong and didn't say, and even if... Given that the ALJ, I mean, it seems like it has to be preserved in exceptions, right? That the employer says, look, my position is that we weren't acting in response to protected activity. That exception was clear. And then in order to preserve the issue that GM makes relevant, it would also have had to say, and even if we had, this is the kind of thing for which we fire people all the time. And in fact, we have a policy against foul language in the workplace or speaking with indirect insubordination to supervisor, but there's nothing in the evidence regarding that. So I'm just... I feel like we're a little stuck. I mean, are we in your view, in a position, if we disagree with the board on this, to enforce where you have said as an institutional matter that you no longer are seeking to enforce? It puts us in a very uncertain position. From my experience, this certainly, the instances where the board asks for, depending on the nature of it, either the whole case or an issue to come back based on a change of intervening law, that happens. And over the last few years has happened with some regularity. And the board acted consistent with that here. These issues about what were or were not preserved sort of gets into the arguments that would normally be made based on section 10E about whether the court would have jurisdiction to consider those arguments because they were or were not raised at various times. Well, but what we always... I mean, I thought it was fairly clear that if it seems like remand would be futile, because on the record, it would be irrational for the agency to reach a contrary decision. We do that in administrative law cases, and I don't think the board's an exception. So we do that as an exception to the remand rule. And unless the board is planning to allow all kinds of new evidence in, and maybe that's what the board's planning to do, but if they're planning to decide it on this record, and if, and I'm just hypothetical, but if we were to think that it would be irrational on this record to find that the firing well, was not an unfair labor practice applying the right line test, where there's no evidence that they would get fired otherwise, then why would we remand? Well, Your Honor, my recollection is that the company had disputes with the ALJ's right line analysis, and that the board didn't address those challenges because it went right to Atlantic Steel. I don't recall, well, one of the problems that we've had is that the appendix and the administrative record do not contain the employer's exceptions brief, the exceptions themselves, and the only part that I see them, I mean, they do mostly focus on Atlantic Steel and on the notion that it was, that there was an animus causing this discharge, but also the more when you can infer what one can infer from the board's response to the exceptions describes the respondents' exceptions, and they don't go into any argument that they would have taken this action in any event, even apart from any putative animus. It's just not in there. Yes, Your Honor, I would have to look at the respondents or the company's brief in support of exceptions. I mean, certainly at this point, not necessarily having the foresight maybe to prepare for that line of reasoning, and that would sort of be presupposing what the board would want to do in terms of barring the company from making any of the arguments that it had made before without, again, sort of looking at what had been argued before, and counsel I know will get a before. Well, to the point about what could happen on remand, that basically that there's, that this case would come out the exact same way because they hadn't preserved any arguments to be making. I thought that was a line of inquiry here. I'm just confused by the board's position on this, just because Rightline was in the case before the ALJ. Correct. And the ALJ said this is the governing test, right? And later, it turns out the board says otherwise, but when the ALJ says this is the governing test, and the parties have briefed, and then the parties have an opportunity to make a record, and then they have an opportunity to raise exceptions, it does seem awfully much like a completely second bite at the same apple for the board to say, oh, now that the board has clarified that it's not interested in Atlantic Steel, we're going to send this back for redo under Rightline, which, as I read the record, was already litigated the first time around. But it was not ruled on by the board itself, Your Honor. The board didn't address the ALJ. I see. So it could go back to the board on the existing record and just say board, or we could say it wasn't preserved, and therefore, no jurisdiction. Well, certainly, I can't say if this were to go back to the board, I can't say whether the whether company would file a motion to reopen the record or, or whether the board would ask for position statements or might just file the motion to reopen, shouldn't we get a letter on The company filed a motion to reopen, which the board through its executive secretary did deny, because at that time, the record, the record had been filed with the court. So the board no longer has any jurisdiction over the case under the act. So that motion would have to be upon, upon remand. And of course, at the conclusion of appellate proceedings, because the record would have to come back to the board for it to exercise jurisdiction. You know, certainly, the, the board always has an interest in having it, its orders enforced. This is a discharge where the board obviously always takes great interest. But in these kinds of cases where there is a change in the law, it does ask for it back to analyze. I've had some experience with this. I generally there's an opposition to it, but parties usually are interested in the change of law because it's often favorable to them. Obviously, I certainly stand by our briefing on Atlantic Steel, as being a strong case under then existing board law. Well, we're talking about a discharge of an employee. So a lot of time has passed already. And so if it's just going to the board and not back to the ALJ, how long will this process take? Because you got an employee here who's been discharged. Yes, Your Honor. And obviously the, I can't predict what will happen when it goes back to the board. The board certainly could solicit position statements from the parties. I've seen instances in that happening. The board could decide, look at the essentially all the pleadings in this case and say, okay, looking at the party's arguments about the right line issue, we're now going to decide the case just based on those pleadings. Everything's there. The board could decide to send it back for further hearing if it thought that more evidence was warranted. But it is true that essentially the case was sort of litigated on right line, but based on the company's defense, the ALJ sort of turned the affirmative defense into an Atlantic analysis. And then as the board pointed out, based on what the company's argument was, you don't do a right line because pre-General Motors, the board was not pulling apart protected activity and misconduct occurring during it. It just sort of lumped it all together and analyzed whether the misconduct was so egregious. But now in General Motors, the board has said for a lot of concerns voiced by this court and other courts that we are going to pull those apart. And we are going to analyze this under traditional right line where the General Counsel will make his showing to the board. The board will then, then the burden shifts to the affirmative defense. And there's always the sort of pretext bounce back to the General Counsel. Can I just ask before I forget that it would be helpful to have the petitioner's sections brief? As I said, we got the record, but it's not included. And that would help us evaluate the preservation question, I think. The board can provide those as soon as argument ends to the clerk that we previously provided the requested for answering brief and reply brief. I can do that as soon as argument ends, Your Honor. Perfect. Thank you. I mean, sir, the board's view itself as having discretion to excuse any forfeitures. Under Section 10E? Just under whatever. Well, the board certainly, sort of internally, if issue isn't raised in an exception, then it won't generally address it. So for instance, you know, a party hasn't accepted to a finding by a judge, and then the board adopts it in that case, then maybe you get a motion for generally absent some extraordinary circumstance, then the board would say it's been waived or forfeited by not raising it to us. Maybe an intervening change in law is an extraordinary circumstance, and the board's ability to consider issues like that may be greater than our ability to consider issues like that. Yes, Your Honor, certainly. And again, that sort of depends how this plays out. I've had experience that runs the gamut when a case comes back. Sometimes the board does ask for parties' position statements, and sometimes the board does not. Sometimes parties submit them anyways. And sometimes then the board just decides. It really depends on what the board wants to do based on what it sees in the record and how the case was litigated. And I certainly can't bind the board's hands and commit it to one course of action or another, and I'm sure counsel would have his own strategy if the case were to go back on this issue. My colleagues have further questions? Okay. Thank you very much, Mr. Cantor. And we will give Mr. McHarg two minutes. Thank you, Your Honor. I'll be very, I thought the clerk asked for these briefs the other day, but for the record, I think it's pages 12 through 15 of our brief in support of exceptions covers our right-line appeals. And in my opinion, exceptions 12 and 13 would cover that, a finding that the behavior was violated company policy would be inclusive of same-thing-anyway type defense. Adding to other issues that came up. Similarly, the board was silent in the 8A5 finding that we denied access to the union. However, the briefs and parties failed to recognize that the board didn't even affirm the ALJ. They were just silent. It's effectively a pocket veto, and it's difficult for an appellant to hit that moving target. As Your Honor noted, many of these unfair labor practices were vague and not considered within their context. The first one that Judge Millett mentioned had the quantum leap analysis where they analyzed conduct four months and attributed it backwards in time. The idea of how would a reasonable employee react to that, I mean, the statement things will not be the same is possibly the most amorphous. I don't know about that. I don't think he's predicting positive improvements. And there's no evidence that he was making an economic statement of fact about the nature of the business. I'm not arguing that, Your Honor. I think you'd have to make it under Giselle. There has to be an economic business basis for the comment. If it otherwise could be, you know, it's interpreted certainly as things are going to get worse. That's not talking about business. So what was he talking about? What was going to get worse? That section of Giselle goes to predictions, Your Honor. The free speech proviso. He absolutely does not say things are going to get worse. The quote that's credited, he denied it, of course. The finding goes against those. But the quote is that things would not be the same. Right. But no one seems to think, are you telling me that he was making that in sort of a cockeyed optimist statement that things are going to get much better? No, I'm sorry, Your Honor. I'm not saying that either. I'm saying not the same may mean exactly what it says. It's not that it is not better or worse. It literally means different, as in, you know, there'll be a third party here. Not the same. You know, there'll be seniority lists, vacations will be handled different. I mean, not the same may mean literally what it says. They didn't, even by the credited testimony, there was not extensive conversation about this. They were talking about the price of T-shirts. I mean, maybe he meant that they'd have to buy T-shirts in the future. I wasn't there either. But I do think something is vague, is not the same. All of the cases- So if he meant I'm not going to provide you T-shirts, you guys vote go on a strike, I'm not going to provide you T-shirts anymore like I have in the Your Honor. He was still buying the T-shirts in the course of the conversation that took place. So I don't think he was trying to change that policy or make it more burdensome at that time. As I, you know, as I said, he denies it. So you know, we can't get we're not here attacking that collaterally. We know that's a fool's errand. So we're taking the finding that we that we have. I'm just saying that I think in this circumstance with the evidence we have, the words mean literally what they say, not the same. My colleagues have any further questions? No, thank you. All right. Thank you, Mr. McHarg. Have a good weekend, everyone. Thank you very much for your time.
judges: Millett, Pillard, Katsas